**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                               **CR. No. 97-702 JC**

**CARLOS RAMOS-CHAVEZ,**

          **Defendant.**

**MEMORANDUM OPINION AND ORDER**

The subject of this Memorandum Opinion and Order is the defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 20], filed January 22, 1998.  On February 3, 1998 I held an evidentiary hearing on this motion in Las Cruces, New Mexico.  Border Patrol Agents Eduardo Calanche, Joseph Muñiz, and Walter Harwell testified on behalf of the government.  Tim Kling testified on behalf of the defendant.  Based on the testimony of these witnesses, I make the following findings of fact and conclusions of law.

**I.  Findings of Fact**

This case arises from the investigatory stop of the defendant's vehicle on October 23, 1997 as he was traveling north on New Mexico Highway 11 in a blue and white Ford pickup truck.  After Border Patrol Agent Muñiz stopped the defendant he searched defendant's truck and found a quantity of marijuana.

On the evening of October 21, 1997 Border Patrol Agent Eduardo Calanche was on duty in Columbus, New Mexico, a small town of about nine hundred people near the Mexican border,

when he received a radio call from Agent Felipe Barrios about an anonymous phone call Agent

Barrios had received.  The anonymous caller told Agent Barrios that within the next few days a

smuggling operation might take place in which illegal aliens would be transported from the

Suncrest Inn in Columbus.  The Suncrest Inn is a common staging place for alien smugglers.  The

anonymous tipster described the two vehicles that would be involved in the operation as a "blue

over white" Ford pickup truck and a white Ford pickup with an extended cab.  Agent Calanche

understood that a "blue over white" pickup truck is a truck that is blue on top and white on the

bottom or is a truck that is blue and white striped.

Shortly after receiving the call from Agent Barrios, Agent Calanche passed the

information along to other Border Patrol agents.  Then, Agent Calanche, along with Agents

Muñiz, Martinez, and Murray, went to the Suncrest Inn to investigate, but the agents saw nothing

the evening of October 21, 1997 to confirm the information in the tip.  Agent Calanche returned

repeatedly to the Suncrest Inn during the afternoons and evenings of October 22 and October 23

to look for any evidence that might corroborate the anonymous tip, but as late as 6:30 p.m. on

October 23 he had found nothing suspicious at the Suncrest Inn.  Furthermore, Agent Calanche

saw no trucks in Columbus on October 23 matching the descriptions in the tip.

Agent Joseph Muñiz has worked at the Deming, New Mexico Border Patrol station for

over nine years.  He is very familiar with the patterns of alien smuggling in the area.  Agent Muñiz

testified that due to increased efforts to prevent illegal entries into Texas and Arizona, the border

states adjoining New Mexico, the area surrounding Columbus, New Mexico has recently become

a much more heavily used alien smuggling corridor.   Highway 11 is the only paved road in the

area that leads directly north from the border with the Republic of Mexico.

On the evening of October 23, 1997 at about 8:00 p.m. Agent Muñiz was parked fourteen miles north of the Mexican border beside Highway 11, a route he has found to be popular with alien smugglers.  At around 8:15 p.m. he saw the defendant's truck pass by in the dark heading north.  The Ford pickup truck the defendant was driving was dark blue with a wide white center stripe.  It was moving at approximately fifty five or sixty miles per hour.  Agent Muñiz, who is familiar with local traffic regularly seen on that stretch of Highway 11, did not recognize the vehicle.  Agent Muñiz admitted that, as he observed the truck passing his position, he saw nothing suspicious about the way the truck was loaded or occupied or about the manner in which it was being driven.  The defendant committed no traffic violations and the bed of the truck was not riding low.  The defendant was the sole occupant and made no unusual movements as he passed Agent Muñiz' patrol car.  In addition, Agent Muñiz admitted that at night it was difficult to distinguish between a pickup truck with a dark blue top and one with a black top.

Agent Muñiz drove from his parked position and followed the truck for about two miles and then pulled the defendant over.  Agent Muñiz acknowledged that the anonymous tip was the primary reason he pulled the defendant over and that the route, direction of travel, and the time of day added to his suspicions.  While he followed the truck northward on Highway 11 before stopping it, Agent Muñiz, who was highly experienced in detecting unusual driving behavior of alien smugglers and the presence of aliens, saw nothing suspicious.  The driver drove straight without weaving or drifting and did not vary his speed.  The bed of the pickup did not appear to be riding low, which suggests it was not heavily loaded with persons or anything else.  Agent Muñiz failed to notice any movements of the driver's body, such as slouching down in his seat, that would indicate the driver was nervous or concerned about the officer following him.  Over

the two mile course of tailing the defendant's pickup Agent Muñiz did not see anyone in the bed

of the pickup and did not observe anything that would tend to suggest the presence of persons in

the pickup bed.  As he approached the truck after stopping it, Agent Muñiz saw no one concealed

in its bed.  In fact, no illegal aliens occupied the defendant's truck.  Agent Muñiz then spoke to

the defendant, who at that point appeared nervous.  The defendant consented to a canine sniff of

the truck which led to the discovery of the marijuana.

## II.  Analysis

The defendant, Carlos Ramos-Chavez, argues that the totality of the circumstances

surrounding the traffic stop of his truck did not give rise to reasonable suspicion of criminal

activity.  He questions only the validity of the stop itself and does not challenge the

constitutionality of his post-stop detention, his questioning, the search of his truck, or any other

event that transpired subsequent to the stop.  The defendant seeks to suppress the evidence

against him that was gathered as a result of the stop.

## A.  Legal Standard

The Fourth Amendment provides that "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized."  U.S.

CONST. AMEND. IV.  The Supreme Court has held that the "touchstone of the Fourth Amendment

is reasonableness."  Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803 (1991).

Reasonableness, in turn, is measured in objective terms by examining the totality of the

circumstances.  Ohio v. Robinette, 117 S.Ct. 417, 421 (1996).  Thus, a detention is justified at its

inception only if law enforcement officials are aware of specific articulable facts, together with

rational inferences from those facts, that reasonably warrant suspicion that the detained individual

may be engaged in criminal activity.  See United States v. Cantu, 87 F.2d 1118, 1121 (10th Cir.),

cert. denied, 117 S.Ct. 265 (1996).

In keeping with this principle, the Supreme Court held in United States v. Brignoni-Ponce

that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop

vehicles only if they are aware of specific articulable facts, together with rational inferences from

those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally

in the country."   422 U.S. 873, 884, 95 S.Ct. 2574, 2577 (1975).  The law does not specify a

minimum number of factors necessary to constitute reasonable suspicion,  United States v. Lopez-

Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994), and each case turns upon its own facts.

However, in Brignoni-Ponce the Court articulated a non-exhaustive, multi-factor test to guide a

"totality of the circumstances" inquiry.  Brignoni-Ponce, 422 U.S. at 884-85, 95 S.Ct. at 2581-82

(1975).  The Tenth Circuit has summarized this test as follows:

> In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of factors, including: (1) characteristics of the area in which the vehicle is encountered;  (2) the proximity of the area to the border;  (3) the usual patterns of traffic on the particular road;  (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments;  and (8) the appearance that the vehicle is heavily loaded.

United States v. Lopez-Martinez, 25 F.3d 1481, 1483-84 (10th Cir.1994) (quoting United States

v. Monsisvais, 907 F.2d 987, 990 (10th Cir.1990), appeal after remand, 946 F.2d 114 (10th

Cir.1991) (citing Brignoni-Ponce, 422 U.S. at 884-85, 95 S.Ct. at 2581-82)).  The Tenth Circuit

has further noted that "[n]either <u>Brignoni-Ponce</u> nor its progeny identify a minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria. Indeed, such an approach would be antithetical to a totality of the circumstances inquiry." <u>Lopez-Martinez</u>, 25 F.3d at 1484.  Rather, the factors listed in <u>Brignoni-Ponce</u> should serve merely as a guide for determining whether Agent Muñiz' stop of the defendant was reasonable under the Fourth Amendment.

### B.  The Anonymous Tip

At the time that Officer Muñiz stopped the defendant's pickup truck, he had obtained the information received by Border Patrol agents from the anonymous tipster two days earlier.  The tipster stated that a smuggling operation of illegal aliens might be staged within the next few days at the Suncrest Inn in Columbus, New Mexico and that the aliens would be transported in one of two trucks.  The caller also gave rather general descriptions of the two vehicles that might be involved in the operation: a "blue over white" Ford pickup and a white pickup with an extended cab.  The defendant's truck was consistent with the first description.

The Supreme Court in <u>Alabama v. White</u>, 496 U.S. 325, 110 S.Ct. 2412 (1990), adopted a totality of circumstances test to determine whether an anonymous tip can provide reasonable suspicion for a <u>Terry</u> stop:

> Reasonable suspicion...is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors–quantity and quality–are considered in the  totality of circumstances–the whole picture ...that must be taken into account when evaluating whether there is reasonable suspicion.  Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

496 U.S. at 329, 110 S.Ct. at 2416 (citations omitted).  In determining whether under the totality

of the circumstances the tip is sufficiently reliable to provide reasonable suspicion, I must consider

the credibility or veracity of the informant, the basis of the informant's knowledge, and the extent

to which the police are able independently to verify the reliability of the tip. White, 496 U.S. at

328-29, 331-32, 110 S.Ct. at 2415-16, 2416-17.

In this case, there is only minimal, rather general information in the anonymous tip. While

the tipster described the staging point of the smuggling operation, he or she did not give a specific

time frame beyond the fact that it would occur within the next few days. The tipster did not say

how many aliens would be transported or what the final destination would be. The informant

gave no names or descriptions of the people who would be involved in the illegal activities. The

descriptions of the vehicles that might be involved in the smuggling were also very general. No

license plate numbers or even the state of license were identified. No distinguishing

characteristics such as dents, damage, tool racks, fuel tanks, or even a model year were given to

the Border Patrol.

Furthermore, there is no way to assess the quality of the information in the tip. Because

the tipster called anonymously there is no information about the veracity of the informant or the

basis of his or her knowledge. Finally, the information contained in the tip about the use of the

Suncrest Inn as a staging point for an illegal smuggling operation was never confirmed by the

Border Patrol, despite the Agency's continuous investigation of the hotel from the time of the tip

until as late as 6:30 p.m. on the day Agent Muñiz stopped the defendant. There is simply nothing

tending to establish the reliability of the tip. Standing alone, the anonymous tip does not exhibit

sufficient indicia of reliability to provide the requisite reasonable suspicion needed to stop the

defendant's truck.

7

### C.  <u>Brignoni-Ponce</u> Factors

The United States argues that in addition to the anonymous tip, there were other circumstances surrounding Agent Muñiz' stop of the defendant that aided in the development of reasonable suspicion.  These circumstances can be analyzed best within the framework of <u>Brignoni-Ponce</u>, as interpreted by the Tenth Circuit in <u>Lopez-Martinez</u>.  In this case the first two <u>Brignoni-Ponce</u> factors on the list of factors enumerated in <u>Lopez-Martinez</u> have been met.  First, the area where the defendant was stopped is one known to Border Patrol Agents as a smuggling corridor and the defendant was traveling north, away from the border on Highway 11, the only paved north-south road in the area.  Second, the stop of the defendant's truck took place a mere fourteen miles from the international border.

The third factor, patterns of traffic on Highway 11, is neutral in this case.  Neither the defendant nor the government presented testimony at the hearing regarding the patterns of traffic on Highway 11.

The fourth factor, the experience of the agent with alien smuggling traffic, points in favor of reasonable suspicion.  Agent Muñiz testified that in his experience pickup trucks are often used to smuggle illegal aliens into the United States.  The stop took place soon after dark, the time of day when, as Agent Muñiz testified, most smuggling of illegal aliens takes place.  In addition, Agent Muñiz testified that he did not recognize the defendant's truck as being from the Columbus area.

On the other hand, the fifth through the eighth factors weigh against a finding of reasonable suspicion.  As to the fifth factor, there was no testimony about recent illegal border

8

crossings in the area beyond the general testimony that the region was known as a busy smuggling corridor.   However, the extensive surveillance of the Suncrest Inn had not disclosed any recent crossings.  In regard to the sixth factor, there was nothing unusual about the defendant's behavior; defendant made no attempt to evade Agent Muñiz and his operation of the vehicle appeared to be normal.  The seventh factor, unusual aspects of the vehicle such as concealed compartments, is absent and adds no suspicion.  What Agent Muñiz saw can be described, in the vernacular, as a "plain ole pickup."  Finally, as to the eighth factor, there was nothing inherently suspicious about the pickup truck the defendant was driving at the time of the stop and the truck did not appear to be heavily loaded.

Thus, the only Brignoni-Ponce factors, as enumerated in Lopez-Martinez, that are present in this case are: the first factor—Agent Muñiz encountered the defendant on a road known to Border Patrol Agents as a common smuggling route; the second factor—the defendant was stopped fourteen miles from the border, and; the fourth factor—the stop occurred soon after dark, which, in Agent Muñiz' experience, was a time favored by smugglers for transporting aliens. None of these features of vehicular travel is objectively suspicious; further, when taken together these facts remain consistent with innocent travel.  As the Supreme Court has stated, reasonable suspicion cannot be founded upon "circumstances [that] describe a very large category of presumably innocent travelers, who would [then] be subject to virtually random seizures." Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754 (1980) (finding that a DEA agent lacked reasonable suspicion to detain a defendant in an airport when the defendant had arrived in the early morning hours from a city known as a major port of entry for illegal drugs, carried no luggage other than a shoulder bag, and appeared to be trying to conceal the fact that he was

traveling with his companion).  The few <u>Brignoni-Ponce</u> factors available to Agent Muñiz did not

give him reasonable suspicion to stop the defendant.

### D.  Conclusion

Because neither the anonymous tip nor the <u>Brignoni-Ponce</u> factors independently support

reasonable suspicion, I must now determine whether in combination they gave Agent Muñiz

reasonable suspicion of criminal activity.  After examining the totality of the circumstances

surrounding the stop of the defendant, I find that Agent Muñiz did not have reasonable suspicion.

The unreliable anonymous tip and the fact that the defendant was driving north on a road often

used by smugglers near the border after dark do not establish a reasonable basis under the Fourth

Amendment to make an investigatory stop of the defendant's truck.

In making this conclusion I am aware of two recent Tenth Circuit cases in which the court

found that the law enforcement officer had reasonable suspicion to detain a defendant.  However,

both of those cases can be distinguished from this case.   In <u>U.S. v. Gutierrez-Daniez</u>, 131 F.3d

939 (10th Cir. 1997), a Denver police officer was on patrol in an area with a reputation as a

heroin market and gathering place for illegal aliens.  <u>Id</u>. at 941.  While driving in the area, the

officer observed the defendant and another man standing on a sidewalk near a no loitering sign.

<u>Id</u>.  The officer saw the defendant address five or six pedestrians who walked by him.  <u>Id</u>.  One of

the pedestrians stopped and talked to the defendant, but became alarmed and retreated rapidly

when he saw the officer in his marked police car.  <u>Id</u>.  Quickly becoming suspicious of these

activities, the office approached the pair and noticed immediately that the defendant appeared

"tense and nervous."  <u>Id</u>.  After an unsuccessful attempt to speak to the defendant and his

companion, neither of whom spoke English, the officer performed a "pat down" of both men to

check for weapons.  Id.  The Tenth Circuit found that the officer had reasonable suspicion to

briefly detain the defendant because: (1) the defendant was in an area known for criminal activity;

(2) the officer saw the defendant speak to several pedestrians, one of whom became alarmed at

the sight of the officer; and (3) the defendant appeared uneasy, particularly in comparison to his

companion, when the officer approached him.  Id. at 942-43.   Thus, in Gutierrez-Daniez the

defendant's behavior was itself suspicious, and the police officer's suspicions about him were

enhanced by the high crime rate in the area.  By contrast, defendant Ramos-Chavez did nothing

inherently suspicious.  He was merely driving a pickup truck that appeared normal and which he

operated in a legal manner.

Similarly, in U.S. v. Barron-Cabrera, 119 F.3d 1454 (10th Cir. 1997), the defendant was

driving  a rented Ryder truck north on New Mexico Highway 180 between Deming and Silver

City, about forty five miles north of the international boundary, an area the Tenth Circuit

considered "reasonably near" the border.  Id. at 1455 , 1460.   A Border Patrol Agent driving

south on Highway 180 became suspicious of the truck because another rental truck filled with

illegal aliens had recently been apprehended in the area and because the truck was neither towing

nor driving in tandem with a second vehicle.  Id. at 1455.  The officer testified that when his and

the defendant's vehicles met on the road he observed that there was a passenger in the truck; that

the defendant looked at him with wide-eyed surprise; that the defendant then looked straight

forward at the road with both hands on the steering wheel; and that the passenger also looked at

the officer and then immediately stared straight ahead.  Id. at 1456.  His suspicions aroused, the

officer turned his car around and began following the defendant's truck northbound on Highway

180.  Id.  The officer could see in the truck's side mirrors that the defendant and his passenger

11

were "keeping an eye" on the Border Patrol car.  Id.  He also observed that the truck slowed from

58 miles per hour to about 45 miles per hour and touched both the shoulder of the road and the

center line.  Id.  The officer then pulled over the defendant's truck and searched it without his

consent, id., an act for which the court found there was reasonable suspicion.  Id. at 1462.  Just as

in Gutierrez-Daniez, the law enforcement officer in Barron-Cabrera had substantial information

about the defendant's inherently suspicious behavior–including the change in the defendant's

driving patterns once he was followed and the occupants' reactions to seeing the police car–that

Agent Muñiz did not have in this case.  Unlike the factors present in Gutierrez-Daniez or Barron-

Cabrera–such as solicitation of passersby or erratic driving and a look of fear at the sight of the

police--none of the factors in this case are objectively suspicious.  Instead, the circumstances

surrounding the stop of the defendant in this case, such as proximity to the border and travel after

dark on a road known for smuggling of aliens, are entirely consistent with innocent travel and

therefore raise only a minimal degree of suspicion.   See United States v. Hall, 978 F.2d 616, 621

(10th Cir. 1992).  The level of suspicion surrounding the defendant was not significantly raised by

the fact that his pickup truck fell loosely within the rather broad description contained in the

untrustworthy anonymous tip.

The Ninth Circuit aptly described the principle that applies to the situation in this case

when it stated: "We are not prepared to approve the wholesale seizure of miscellaneous persons,

citizens or non-citizens, who are seen driving any place near the Mexican border . . . in the

absence of well-founded suspicion based on particular, individualized, and objectively observable

factors which indicate that the person is engaged in criminal activity."  United States v.

Rodriguez, 976 F.2d 592, 596 (9th Cir. 1992).  The Fourth Amendment prohibits law

enforcement officers from stopping motorists who are driving near the border after dark merely

because their vehicles match a vague description given by an unreliable anonymous tipster.

Therefore, it is ORDERED that the defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 20] is GRANTED and the evidence obtained by law enforcement officers as a consequence of the illegal stop will be suppressed.   See Wong Sun v. United States, 371 U.S. 471 (1963).


_____
UNITED STATES DISTRICT JUDGE